## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KRISTEN GORENBERG, derivatively on behalf of SLACK TECHNOLOGIES, INC., | Case No.: |
| Plaintiff, | |
| v. | |
| STEWARD BUTTERFIELD, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, JOHN O'FARRELL, CHAMATH PALIHAPITIYA, and GRAHAM SMITH, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| SLACK TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

### <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Kristen Gorenberg ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant Slack Technologies, Inc. ("Slack" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Slack with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.     This is an action on behalf of persons and/or entities who purchased or otherwise acquired Slack common stock and continue to hold said stock to the present.

2.     Slack is a technology company that maintains, and offers subscriptions to, a cloud-based collaboration and productivity platform (the "Platform"), which is used primarily by business teams and social groups. Slack publicly launched in 2014.

3.     On June 20, 2019, Slack held a direct public offering ("DPO" or "Offering") of 118,429,640 shares of its existing Class A common stock. In a DPO, unlike in an initial public offering, current owners of a company's common stock choose to sell their shares to the public without underwriters and without any new shares being issued by the company. Moreover, in a DPO, Company insiders' shares are not subject to a lock-up period and can be liquidated immediately.

4.     On the day of the DPO, Slack's share price opened at $38.50 per share and was trading as high as $42.00 per share, to close at $38.62 per share. Slack's existing stockholders, especially its officers and directors, made a fortune selling their shares to investors in the DPO.

5.     For example, Slack's Chief Executive Officer ("CEO"), James Butterfield, sold approximately 1.4 million of Slack Class A common stock in the DPO for gross proceeds of more than $53 million.

6.     DPO investors were far less fortunate. Less than three months after the DPO, on September 9, 2019, the price of Slack Class A common stock was $24.92 per share, a decline of over 35% and approximately a loss of $1.48 billion in market cap.

7.     The primary causes of the sharp decline in the price of Slack's Class A common stock were two-fold. *First,* Slack's platform was particularly susceptible to service outages, which

it had experienced in the past. Yet, the Company had also guaranteed certain of its subscribers that it would reimburse them 100 times the cost of lost services, even if those subscribers had not been affected by the outages and even if they had not complained or requested reimbursement credits. This amounted to over eight million dollars in lost revenue in the quarter ending just after the DPO took place. Indeed, Slack's fiscal second quarter revenue of $145 million was offset by $8.2 million in credits to customers for service-level disruptions.  Absent these service-level disruptions, revenue would have been 5% higher. Slack later described its reimbursement program as "unusual," "exceptionally generous" and "outrageously customer-centric."

8.     *Second*, by the date of the DPO, Slack's competitors were rapidly eroding its market share and, almost as soon as the DPO closed, Slack's top competitor, Microsoft's "Teams" product, had surpassed it in number of daily average users by several million (a lead which grew to more than eight million by November 2019).

9.     Slack's directors and officers, who were responsible for issuing the Registration Statement and Prospectus for the DPO (collectively, "Offering Documents")[1], knew or should have known that these two eventualities were likely to (and would) occur at the time of the DPO. Yet, the Offering Documents failed to disclose, and/or contain true statements regarding, such matters.

---

[1] Slack confidentially submitted a Form S-1 Registration Statement to the SEC on February 1, 2019. Slack publicly filed same on April 26, 2019, and subsequently filed three amendments thereto on May 13, May 20, and May 31, 2019, respectively. Slack filed its most recent Prospectus to the Registration Statement on June 20, 2019. Unless otherwise specified herein, all references to "Registration Statement" are to the most recently filed Registration Statement, and all references to "Prospectus" are to the most recently filed Prospectus. References to "Offering Documents" collectively refer to the Registration Statement and Prospectus. Slack's Prospectus Supplement, which was filed on September 5, 2019, is not included in the terms "Offering Documents" or "Prospectus" as used herein.

10.     Defendants omitted material information from its shareholders and made material and false and misleading statements to its shareholders  regarding the Company's business, operational and compliance policies, specifically the platform's power outages, the revenue lost from platform power outages, its market share, and the loss of its market share to Slack's top competitor, Microsoft's "Teams" product from its DPO until its second quarter fiscal year 2020 earnings release on September 4, 2020, at the earliest.  When the truth about the reimbursement program and Teams competition began to be disclosed in Slack's second quarter fiscal year 2020 earnings release on September 4, 2020, the price of Slack's Class A common stock plummeted by nearly 20% per share (over the next three trading days). By that time, many of Slack's original shareholders, including its directors and officers, had sold large numbers of their shares in the DPO and had reaped substantial benefits.

11.     As a result of the foregoing, Slack and certain of its directors and officers – including six current directors – have been named as defendants in a federal securities lawsuit by investors who allege they were damaged when they purchased Slack shares in the DPO pursuant to the materially false, misleading and/or incomplete Offering Documents. *Dennee v. Slack Technologies, Inc., et al.*, 3:19-cv-05857-SI (N.D. Cal.).

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the claims in this case under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise

of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Slack is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Slack, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.     Moreover, according to Article VIII of Slack's Amended and Restated Bylaws, "the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, [or] (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee or stockholder of the corporation to the corporation or the corporation's stockholders . . . shall be a state or federal court located within the state of Delaware . . . ."

## PARTIES

### Plaintiff

16.     ***Plaintiff Kristen Gorenberg*** ("Gorenberg") is a current owner of Slack's Class A common stock. Gorenberg acquired her Slack stock pursuant and/or traceable to the DPO. She has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein. Gorenberg will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of Illinois.

**Nominal Defendant**

17.    ***Defendant Slack Technologies, Inc.*** is a corporation with its principal executive offices located in San Francisco, California. Slack's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WORK."

**Director Defendants**

18.    ***Defendant Stewart Butterfield*** ("Butterfield") is, and was at the time of the DPO, the Co-founder and Chief Executive Officer ("CEO") of the Company, and the Chair of Slack's Board of Directors (the "Board"). In the DPO, Butterfield sold approximately 1.4 million shares of Slack Class A common stock for gross proceeds of $53.2 million. To date, Butterfield has sold Slack Class A shares for gross proceeds of more than $68.7 million. During fiscal year 2019, Butterfield received 10.3 million in total compensation from the Company.  Upon information and belief, Butterfield is a citizen of California.

19.    ***Defendant Andrew Braccia*** ("Braccia") is, and was at the time of the DPO, a director of the Company and a member of the Board's Compensation Committee. Braccia is a partner at the Accel venture capital firm, which was one of Slack's largest shareholders prior to the DPO, and which sold 8.5 million shares of Slack Class A common stock for gross proceeds of $329.5 million.  Upon information and belief, Braccia is a citizen of California.

20.    ***Defendant Edith Cooper*** ("Cooper") is, and was at the time of the DPO, a director of the Company and the Chair of the Board's Compensation Committee and of its Nominating and Corporate Governance Committee. Prior to the DPO, Cooper held 273,428 Slack Class B shares, which could be easily converted to Class A shares and liquidated once Slack began trading on the NYSE due to the DPO.  Upon information and belief, Cooper is a citizen of New York.

21.     **Defendant Sarah Friar** ("Friar") is, and was at the time of the DPO, a director of the Company and a member of the Board's Audit and Risk Committee. Prior to the DPO, Friar owned 406,017 Slack Class B shares, which could be easily converted to Class A shares and liquidated once Slack began trading on the NYSE due to the DPO.  Upon information and belief, Friar is a citizen of California.

22.     **Defendant John O'Farrell** ("O'Farrell") is, and was at the time of the DPO, a director of the Company and a member of the Company's Audit and Risk Committee. O'Farrell is a general partner at Andreesen Horowitz venture capital firm, which was one of Slack's largest shareholders prior to the DPO, and which sold 3 million shares of Slack Class A common stock for gross proceeds of $116 million.  Upon information and belief, O'Farell is a citizen of California.

23.     **Defendant Chamath Palihapitaya** ("Palihapitaya") served as a director of the Board at the time of the DPO. Palihapitaya is the founder and CEO of Social Capital, which was one of Slack's largest shareholders prior to the DPO, and which sold 1 million shares of Slack Class A common stock for gross proceeds of $39.7 million.  Upon information and belief, Palihapitaya is a citizen of California.

24.     **Defendant Graham Smith** ("Smith") is, and was at the time of the DPO, a director of the Board and the Chair of the Company's Audit and Risk Committee and a member of its Nominating and Corporate Governance Committee. Prior to the DPO, Smith held 210,000 Slack Class B shares, which could be easily converted to Class A shares and liquidated once Slack began trading on the NYSE due to the DPO.  Upon information and belief, Smith is a citizen of California.

25.     Defendants Butterfield, Braccia, Cooper, Friar, O'Farrell, Palihapitaya, and Smith are collectively referred to herein as the "Director Defendants."

**Non-Defendant Directors**

26.     ***Non-Defendant Sheila Jordan*** ("Jordan") has been a director of the Company since September 25, 2019 and is a member of the Company's Audit and Risk Committee.

27.     ***Non-Defendant Mike McNamara*** ("McNamara") has been a director of the Company since December 3, 2019 and is a member of the Company's Compensation Committee and of its Nominating and Corporate Governance Committee.

## SLACK'S CORPORATE GOVERNANCE

28.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

29.     The conduct of the Director Defendants complained of herein involves a violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a violation of their duties to the Company and its investors.

## SLACK'S CODE OF CONDUCT

30.     The Company maintains a Code of Conduct, which states, in relevant part as of June 7, 2019:

**Financial Integrity, Records and Accounting**

Slack's books, records, accounts and financial statements must be maintained in appropriate detail so that they properly reflect the Company's business activities. Doing so is required both by law and by the Company's internal controls. Our financial, accounting and legal groups are responsible for procedures designed to assure proper internal and disclosure controls, and everyone must cooperate with these procedures to ensure the integrity of the Company's books, records, accounts and financial statements. All information must be recorded accurately, whether it is tracking work hours, expenses (including your expense reports) or sales contracts. When these are timely and accurate, we are able to make informed decisions about how to run our business and plan for the future. Our records,

including disclosures and filings, must be accurate, complete and timely, so that Slack fulfills its obligations to external stakeholders, including its stockholders.[2]

31.     As stated therein, the Code of Conduct applies to all of Slack's officers, directors, and employees:

> This Code has been adopted by our Board of Directors (the "Board") and applies to every director, officer, employee, and independent contractor of Slack and its subsidiaries. Although Slack operates in many countries around the world and our colleagues are citizens of nations with varying laws, regulations, and customs, Slack's commitment to conducting business according to the highest standards of ethical conduct applies across national boundaries. Therefore, all Slack employees, directors, and officers are required to read and comply with this Code. In addition, other persons performing services for Slack may be subject to this Code by agreement. . . .

32.     The wrongful conduct of the Director Defendants violates the Code of Conduct.

## DUTIES OF THE DIRECTOR DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

34.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial

---

[2] *See* https://s23.q4cdn.com/371616720/files/doc_downloads/governance/Slack-Code-of-Conduct.pdf

condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

35.      To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things: (a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public; (b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business operations, prospects and risks to same; (d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; (e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and (f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

36.      The conduct of the Director Defendants complained of herein involves a culpable violation of their obligations as directors and officers of the Company, the absence of good faith

on their part, and a disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

37.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements in its Offering Documents. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Director Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Director Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

39.     The Director Defendants, collectively and individually, initiated a course of conduct that was designed to and did conceal that Slack's stock was materially and systematically overstated during the relevant period.

40.     The purpose and effect of the Director Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Director Defendants' violations of law, including breaches of fiduciary duty; and to conceal adverse information concerning the Company's future and continued growth.

41.     The Director Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.  Because the actions described herein occurred under the Board's authority,

each of the Director Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.     Each of the Director Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Director Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

43.     As an Internet-based, cloud platform services company in an emerging industry, Slack faces two significant risks to its business operations: (1) the risk that service outages will prevent Slack's user/subscribers from accessing the Company's platform, leading them to cancel the services; and (2) that one or more of Slack's competitors will emerge as a threat to Slack's market share, especially if supported by a large, financially dominant technology company, such as Microsoft.

**Slack's Service Outages and Reimbursement Program**

44.     Slack's platform had experienced myriad service outages in the past (in 7 of the 12 months of 2018), but unbeknownst to investors at the time of the DPO, the platform remained highly susceptible to such outages.

45.     Moreover, Slack's directors and officers, who knew or should have known that this was the case, compounded the problem by causing the Company to issue a guarantee to reimburse its subscribers for any service outages at 100 times their subscription rates, even if the subscribers were not negatively impacted by such outages and even if they never requested reimbursements.

**Slack's Competition**

46.     Unbeknownst to investors at the time of the DPO, one of Slack's chief competitors, Microsoft's Teams product, had already gained a significant foothold in the nascent industry and was rapidly increasing its market share. Teams surpassed Slack's number of daily average users just days after the DPO (13 million to 10 million) and expanded that lead significantly in the ensuing months (20 million to 12 million).

**The Offering Documents' False and Misleading Statements and Omissions Concerning Slack's Service Outages, Reimbursement Program, and Competition**

47.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

48.     Under applicable SEC rules and regulations, the Offering Documents were required to disclose known trends, events, or uncertainties that were having, and were reasonably likely to have, and impact on Slack's continuing operations.

49.     The Offering Documents contained merely boilerplate information concerning the risk and possibility of future service outages, but disclosed nothing about the material, present *fact* that Slack's Platform was *highly susceptible* to such outages and, indeed, had experienced outages in seven out of twelve months in 2018. For example, the Prospectus (at pages 19-20) states, in pertinent part:

> ***If there are interruptions or performance problems associated with the technology or infrastructure used to provide Slack, organizations on Slack may experience service outages, other organizations may be reluctant to adopt Slack, and our reputation could be harmed.***
>
> Our continued growth depends, in part, on the ability of existing and potential organizations on Slack to access Slack 24 hours a day, seven days a week, without

interruption or degradation of performance. ***We have in the past and may in the future*** experience disruptions, data loss, outages, and other performance problems with our infrastructure due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, capacity constraints, denial-of-service attacks, ransomware attacks, or other security-related incidents. In some instances, we may not be able to identify the cause or causes of these performance problems immediately or in short order. We may not be able to maintain the level of service uptime and performance required by organizations on Slack, especially during peak usage times and as our user traffic and number of integrations increase. For example, we have experienced intermittent connectivity issues and product issues in the past, including those that have prevented many organizations on Slack and their users from accessing Slack for a period of time. If Slack is unavailable or if organizations are unable to access Slack within a reasonable amount of time, or at all, our business would be harmed. Since organizations on Slack rely on Slack to communicate, collaborate, and access and complete their work, which in many cases includes entire organizations that complete substantially all of their work functions on Slack, any outage on Slack would impair the ability of organizations on Slack and their users to perform their work, which would negatively impact our brand, reputation, and customer satisfaction, and could give rise to legal liability under our service level agreements with paid customers. (Emphasis in current paragraph added.)

Moreover, we depend on services from various third parties to maintain our infrastructure, including Amazon Web Services, or AWS. If a service provider fails to provide sufficient capacity to support Slack or otherwise experiences service outages, such failure could interrupt access to Slack by users and organizations, which could adversely affect their perception of Slack's reliability and our revenue and harm the businesses of organizations on Slack. Any disruptions in these services, including as a result of actions outside of our control, would significantly impact the continued performance of Slack. In the future, these services may not be available to us on commercially reasonable terms, or at all. Any loss of the right to use any of these services could result in decreased functionality of Slack until equivalent technology is either developed by us or, if available from another provider, is identified, obtained, and integrated into our infrastructure. If we do not accurately predict our infrastructure capacity requirements, organizations on Slack could experience service shortfalls. We may also be unable to effectively address capacity constraints, upgrade our systems as needed, and continually develop our technology and network architecture to accommodate actual and anticipated changes in technology.

Any of the above circumstances or events may harm our reputation, cause organizations on Slack to terminate their agreements with us, impair our ability to obtain subscription renewals from organizations on Slack, impair our ability to grow the base of users and organizations on Slack, subject us to financial penalties and liabilities under our service level agreements with our paid customers, and otherwise harm our business, results of operations, and financial condition.

50.     The Offering Documents also disclosed ***very little*** (two paragraphs) about Slack's guarantee and "service level commitments" to reimburse subscribers for outages, and such disclosures were entirely generic. ***Nothing*** was stated about the size or financial impact of the reimbursements, such as the material fact that they were equal to 100 times the cost of users' subscriptions and were paid out regardless of customer impact or requests for same. Nor were the reimbursements cited as a potential consequence of potential bugs in Slack's Platform. For example, the Prospectus (at page 32) states, in pertinent part:

> ***We provide service level commitments under certain of our paid customer contracts. If we fail to meet these contractual commitments, we could be obligated to provide credits for future service, or face contract termination with refunds of prepaid amounts related to unused subscriptions, which could harm our business, results of operations, and financial condition.***
> Certain of our paid customer agreements contain service level agreements, under which we ***guarantee specified minimum*** availability of Slack. From time to time, we have granted credits to paid customers pursuant to the terms of these agreements. We do not currently have any material liabilities accrued on our balance sheet for these commitments. Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, ***we may be contractually obligated to provide affected paid customers with service credits for future subscriptions***, or paid customers could elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales. (Emphasis in current paragraph added.)

51.     By contrast, the Offering Documents discussed in detail (often in terms of exact dollar amounts) Slack's various other "commitments" on numerous occasions – e.g., data privacy commitments, commitments to its partners, debt commitments to lenders, capital commitments, commitments under leases for office space, and IT hosting and datacenter operations commitments.

52.     As for the risk that Microsoft's Teams would surpass Slack in subscribers, the Offering Documents contained boilerplate information about the future possibilities of certain competitors emerging, and discussed Microsoft as its primary competitor, but disclosed nothing about the present, material *fact* that Microsoft's Teams product was already poised to surpass Slack and, indeed, less than one month after the DPO, Microsoft announced that its Teams product had 13 million daily average users to Slack's 10 million (by November 2019 the disparity had increased to 8 million). For example, the Prospectus (at pages 16-17) states, in pertinent part:

> ***The market and software categories in which we participate are competitive, new, and rapidly changing, and if we do not compete effectively with established companies as well as new market entrants our business, results of operations, and financial condition could be harmed.***
>
> Slack is a new category of business technology in a rapidly evolving market for software, programs, and tools used by knowledge workers that is intensely competitive, fragmented, and subject to rapidly changing technology, shifting user and customer needs, new market entrants, and frequent introductions of new products and services. We also compete in various segments of the communication, collaboration, and integration software categories. Moreover, ***we expect competition to increase in the future*** from established competitors and new market entrants, including established technology companies who have not previously entered the market. ***Our primary competitor is currently Microsoft Corporation***. Our other competitors fall into the following categories: productivity tool and email providers, such as Alphabet Inc. (including Google Inc.); unified communications providers, such as Cisco Systems Inc.; and consumer application companies who have entered the business software market, such as Facebook Inc. We also compete with smaller companies that offer niche or point products that attempt to address certain problems that Slack addresses. We further compete against existing software, programs, and tools, such as email. With the introduction of new technologies, the evolution of Slack, and new market entrants, ***we expect competition to intensify in the future***. Established companies may not only develop their own communication and collaboration solutions, platforms for software integration, and secure repositories of information and data, but also acquire or establish product integration, distribution, or other cooperative relationships with our current competitors. For example, while we currently partner with Atlassian Corporation PLC, Google Inc., Okta, Inc., Oracle Corporation, ServiceNow, Inc., salesforce.com, inc., SAP SE, Workday, Inc., and Zoom Video Communications, Inc., among others, they may develop and introduce products that directly or indirectly compete with Slack. New competitors or alliances among competitors may emerge and rapidly acquire significant market share due to factors such as

greater brand name recognition, a larger existing user and/or customer base, superior product offerings, a larger or more effective sales organization, and significantly greater financial, technical, marketing, and other resources and experience. We also compete with niche companies that offer specific point solutions in the communication, collaboration and data use markets, normally focused on specific industries, geographies, or specific use cases, which attempt to address certain of the problems that Slack addresses. In addition, with the recent increase in large merger and acquisition transactions in the technology industry, particularly transactions involving cloud-based technologies, there is a greater likelihood that we will compete with other large technology companies in the future. We expect this trend to continue as companies attempt to strengthen or maintain their market positions in an evolving industry. Companies resulting from these possible consolidations may create more compelling product offerings and be able to offer more attractive pricing options, making it more difficult for us to compete effectively. (Emphasis in current paragraph added.)

Many of our existing competitors have, and some of our potential competitors could have, substantial competitive advantages such as greater brand name recognition and longer operating histories, larger sales and marketing budgets and resources, broader distribution, and established relationships with independent software vendors, partners, and customers, greater customer experience resources, greater resources to make acquisitions, lower labor, and development costs, larger and more mature intellectual property portfolios, and substantially greater financial, technical and other resources. Such competitors with greater financial and operating resources may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards, or customer requirements.

In addition, some of our larger competitors have substantially broader product offerings and leverage their relationships based on other products or incorporate functionality into existing products to gain business in a manner that discourages users from purchasing Slack, including through selling at zero or negative margins, product bundling, or closed technology platforms. Potential customers may also prefer to purchase from their existing suppliers rather than a new supplier regardless of product performance or features. These larger competitors often have broader product lines and market focus and will therefore not be as susceptible to downturns in a particular market. Our competitors may also seek to repurpose their existing offerings to provide software, programs, and tools used by knowledge workers with subscription models. Further, some current and potential customers, particularly large organizations, have elected, and may in the future elect, to develop or acquire their own software, programs, and tools used by knowledge workers that would reduce or eliminate the demand for Slack.

Conditions in our market could also change rapidly and significantly as a result of technological advancements, partnering by our competitors or continuing market consolidation, and it is uncertain how our market will evolve. New start-up

companies that innovate and large competitors that are making significant investments in research and development may invent similar or superior products and technologies that compete with Slack. ***These competitive pressures in our market or our failure to compete effectively may result in price reductions, fewer customers, reduced revenue, gross profit, and gross margins, increased net losses, and loss of market share***. Any failure to meet and address these factors could harm our business, results of operations, and financial condition. (Emphasis in current paragraph added.)

53.    These material omissions regarding Microsoft's Teams product and Slack's falling market share were particularly egregious in light of the fact that, on March 1, 2019, well before the final versions of the Offering Documents were released to the public, the SEC sent Slack a letter requesting that the Company make additional disclosures in its Offering Documents regarding the increasing number of Slack's competitors in the industry. The letter stated, in pertinent part:

> With respect to your estimate of the size of the market opportunity for Slack . . . , clarify your disclosure by addressing the scope of your estimate. For example, disclose whether management views this as the size of the market opportunity for other workplace communication companies as a whole, or if it is specific to Slack. Also, ***balance this disclosure with a discussion of the increasing number of competitors in the industry*** and clarify that your estimate may not be reflective of the actual market for your product. (Emphasis added.)

54.    As a result of the foregoing, the Offering Documents made materially false and/or misleading statements and failed to disclose that, *inter alia*: (a) Slack's Platform was particularly susceptible to service outages and had experienced same in 7 out of 12 months in 2018; (b) compounding this issue, Slack had guaranteed to it subscribers that it would remain without outages 99.99% of the time and, if it failed to meet the guarantee, Slack would reimburse the subscribers 100 times the cost of the lost service, even if the subscribers hadn't experienced disruptions and even if they never complained or requested reimbursement credits; (c) the Company's inability to stay online and inability to scale up its platform as new users were onboarded, which triggered the punitive guarantee, had a significant negative impact on its

revenues and reputation; and (d) the Company was rapidly losing market share to rivals such as Microsoft's Teams product, which soon surpassed Slack in important user metrics.

**The Offering**

55.     The Director Defendants were eager to sell their shares in the DPO and cash in their early investment and stake in the Company as soon as possible, so, on June 5, 2019, Defendant Butterfield sent a letter to the SEC requesting that "the effective date and time of the [Registration Statement] be accelerated to June 7, 2019." The SEC agreed, declaring the Registration Statement effective on June 7, 2019.

56.     On June 20, 2019, the Company's common stock began trading on the NYSE pursuant to the DPO. Slack's stock opened at $38.50 per share and fluctuated in price between $38.25 and $42.00 per share, closing at $38.62 per share.

## THE TRUTH BEGINS TO EMERGE

57.     On June 28, 2019, Slack's Platform suffered service outages across the U.S. and Europe, prompting Slack to issue an incident summary report stating that "some of our servers became unavailable, degrading performance in our job processing system. This resulted in delays or errors . . . ." The Company promised that a "fix" had been implemented to prevent future service outages.

58.     On July 11, 2019, Microsoft announced that its Teams platform had reached 13 million daily average users, surpassing Slack's 10 million daily average users. By November 2019, this disparity had grown significantly, with Microsoft leading by at least 8 million daily average users. During this period, media outlets cited a drop in the Company's stock price of more than 10% attributable to Microsoft's increased competition.

59.     On July 29, 2019, Slack's Platform suffered another large-scale service outage which disrupted services for more than 2,000 users in the U.S., Japan, and Europe.

60.     Later that same day, Market Realist (www.marketrealist.com) published an article entitled, "How Microsoft Teams May Have Caused Today's Slack Outage," which stated, in pertinent part:

> Companies that use Slack (WORK) for team communication, such as Market Realist, all know what it's like to deal with a Slack outage.

> \*       \*       \*

> We run into days like this with the platform nearly once a month. Except for January, a Slack outage has happened once in each month so far this year. If you believe in numerology, you might want to try to find out why outages have happened twice on the 29th (in July and March) and once on the 28th (in June) of the month.

> All jokes aside, it's interesting that the Slack outage comes just days after its promising new update last week. Slack rewrote the code for its desktop and web versions to make them load faster and able to consume less memory. Slack claims that the new version will use 50% less memory and will load 33% faster for a better user interface. Calling, an area in which Slack underperforms Microsoft (MSFT) Teams, will also be smoother. Microsoft has integrated Skype into Teams. As a result, its product has an advantage over Slack in terms of voice and video calling. Did Slack push the new update out too fast, causing today's outage? If that's the case, let's blame it on Microsoft Teams.

61.     Whatever the cause, these service outages triggered the Company's guarantee under service level agreements with certain of its subscribers. Slack guaranteed such subscribers that its service would be available 99.99% of the time for each fiscal quarter. If Slack failed to meet that guarantee, it was obligated to pay those customers 100 times the cost of the downtime, regardless of whether the customers complained or were impacted.

62.     On September 4, 2019, Slack issued a press release (appended as an exhibit to a Form 8-K filed with the SEC) announcing its financial results for the second quarter fiscal year 2020, which ended on July 31, 2019. In the earnings announcement, Defendant Butterfield noted

that revenue growth was 58% year-over-year, "despite a one-time revenue headwind from credits issued in the quarter related to service level disruption." That "disruption" negatively impacted the Company's revenue by $8.2 million.

63.     Later that same day, the Company held its second quarter earnings call. Defendant Butterfield began by issuing prepared remarks that touted the Company's achievements during the quarter, starting with its "record results, with revenue growing 58% year on year." Missing entirely from these remarks was any mention of the $8.2 million in service credits the Company paid due to outages, or the emergence of Microsoft's Teams product.

64.     Slack's Chief Financial Officer, Allen Shim ("Shim") next gave his prepared remarks. Shim began by discussing the exact financial impact of the service credits and disclosing how such impact was "[c]ompound[ed]" by the Company's "exceptionally generous credit payout multiplier." Shim also noted that the credits would have a significant negative impact on the Company's calculated billings in the second half of fiscal year 2020. Shim stated, in pertinent part:

> Revenue growth was above the high end of guidance, despite an ***$8 million one-time revenue headwind from credits issued in the quarter related to service level disruption in the quarter***. Our uptime was 99.9% (or three nines) in the quarter, but this was below our commitment of 99.99% (or four nines). Service level disruption of this magnitude is unusual for us. ***Compounding the financial impact of the downtime was an exceptionally generous credit payout multiplier*** in our contracts dating from when we were a very young company. We've adjusted those terms to be more in line with industry standards while still remaining very customer friendly. We do not expect a revenue impact of this magnitude again.
>
> Our Q2 calculated billings were $174.8 million, growing 52% year-over-year. Trailing twelve month calculated billings were $625 million and grew 65% year-over-year.
>
> Calculated billings were minimally impacted, in the second quarter, by the credits we issued - a headwind of just under $1 million. Calculated billings in the second half of fiscal year '20 will be more significantly impacted due to the way we account for credits.

65.     During the Q&A portion of the call, the first question, from Heather Anne Bellini of Goldman Sachs Group Inc., asked if the Company could explain "what caused the downtime," i.e., service outages during the quarter. Defendant Butterfield responded by blaming the fact that the Company had hit scaling limits it supposedly "didn't realize were built into [its own] system," even though it had hit similar limits along the way from initial development to present. "[W]e're still figuring some of those things out."

> What caused it actually depends how literal and specific we want to get. The actual answer might even be over my head in true technical terms. But if we want to move a little bit further afield from that the more distant answer is ***scaling. So we continue to hit limits that we didn't realize were built into the system***. And at one point when there were 8 people first getting started we thought Slack will be a great tool for 8-person software development team, and then we got our first team with 100 users and we had to reimagine a whole bunch of stuff, not just technically but from the user experience. Then we got teams with 1,000 people and then 10,000 and then we were well over 100,000 with several customers. ***And we're still figuring some of those things out***. Having said that, this is a big area of investment, we've made some great hires on the infrastructure side, we've put a lot more tooling in place, a lot more automated testing. And we definitely have a commitment because we feel it, we understand we are among the heaviest Slack users ourselves, and so any disturbance in availability, it causes a big problem.

66.     Next, Defendant Butterfield discussed the Company's policy on giving customers service credits for outages, which he described as "outrageously customer-centric" and not in line with Slack's competitors. Butterfield admitted that the Company's "payout ratio" was "unusual" in that it was significantly higher than Slack's competitors – which "wouldn't have paid anything out" – and was provided to all customers, "even if they were not specifically affected" by the outages, and even if they never requested it; "we just proactively give it [to them]."

> The last thing I want to note though, ***for the service credits, there is a bunch of things that we do with that are unusual besides what Allen mentioned, which is the payout ratio. One is, customers don't have to request it, we just proactively give it***. And I don't know every detail for this quarter but almost no outages affect all customers, in fact most of them affect like 1% or 0.5% or 3% of customers in any given time. ***And we give those service credits to every customer even if they were not specifically affected. So those policies are outrageously customer-***

*centric*, which is part of our background and our orientation. And that is one of the reasons you see that effect. ***It's not necessarily proportionate to the outage***, because if we had the same SLA as Salesforce or Microsoft or ***any of our peers in the industry, we wouldn't have paid out anything*** because we would have hit the 3 9 they're committed to, it's our 4 9 and the rest of the policies that make a difference.

67.     On this news, the Company's share price fell by almost 20% over the next several trading days, going from $31.07 per share on September 4, 2019 to $24.92 per share on September 9, 2019, on exceedingly high trading volume.

68.     On September 5, 2019, Slack filed its Prospectus Supplement with the SEC in order to "update, amend and supplement the information previously included in the [P]rospectus."

69.     Of note, the Prospectus Supplement (at page 51) added material details about the size of the potential negative financial impact of Slack's service guarantee and reimbursement program:

> ***We provide service level commitments under certain of our paid customer contracts. If we fail to meet these contractual commitments, we could be obligated to provide credits for future service, or face contract termination with refunds of prepaid amounts related to unused subscriptions, which could harm our business, results of operations, and financial condition.***
>
> Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Slack. From time to time, we have granted, and in the future will continue to grant, credits to paid customers pursuant to the terms of these agreements. ***For example, we recently provided approximately $8.2 million in credits to paid customers in connection with availability issues experienced by certain organizations on Slack during the quarter ended July 31, 2019***. Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, we may be contractually obligated to provide paid customers with service credits for future subscriptions, or paid customers could elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales. In addition, we

may modify or reduce the amount of credits we grant to paid customers under such service level agreements. Any modification or termination of such commitments could decrease demand for Slack, impair our ability to maintain and grow the base of users and organizations on Slack, and adversely affect our business. (Emphasis in current paragraph added.)

70.    Moreover, although the Prospectus had disclosed that errors in Slack's software could negatively impact the Company's financial results, market share, and reputation, only the Prospectus Supplement disclosed the potential for such errors to result in "the issuance of credits under our service level agreements with paid customers."

71.    On September 6, 2019, *The Motley Fool's "Industry Focus"* podcast featured a discussion between Dylan Lewis and Evan Niu about Slack's disappointing earnings results. The main drivers of the poor results were the $8 million in service outage credits and Microsoft's increased competition:

**Niu:** . . . *[T]here was a service outage at the end of June*. I don't know if you remember. We use Slack at the [Motley] Fool, so *we were hit by this outage, too*. To compensate for this, they gave out $8 million in credits to customers to make up for the service disruption, which also impacted full-year billings guidance by about $5 million. Not a huge deal [for long-term Company prospects, assuming it does not reoccur in the future], but a little blip there because they did have that outage.

\*        \*        \*

I think that's a lot of the big threat that Slack is facing when it comes to Microsoft Teams and Office 365. There's a survey that came out a few months ago about how a lot of these IT executives and decision makers, who are ultimately who's making this purchasing decision, the customers, a lot of them actually really are considering ramping down their spending on Slack, and putting it back into Office 365. I think most people agree that Slack is better than Teams, but Teams is bundled in with 365, so it's little to no cost to have it on there. And if it's a good enough alternative vs. Slack, which is more expensive, even if it's better, then, for an IT executive that's really looking at their spending budget, that's a pretty compelling thing, if it's good enough and a lot cheaper. I think that that's what's the challenge here for Slack. On the call, CEO Stewart Butterfield provided a couple of examples of customer wins, like, "They chose Slack over 365 because we're the only one that can integrate with all these apps that they've developed, a lot of interoperability," it's an open platform. So, they do have some advantages there. ***But, I think they're pretty***

*clearly showing that, yes, this is something to worry about*. They want to address it and dispel these fears.

**Lewis:** . . . [I]n the case of acquiring new customers, that Office Outlook 365 suite is pretty sticky. If you have people that are so used to using that, it's already installed on their computers, and there's something rolled into it that is Slack-like in some way, well, some corporations might look at that and be like, "It doesn't cost us all that much more to do, and we don't have to retrain thousands of employees to use this other piece of software." *I think it's a rare instance where it may work against Slack a bit.*

**Niu:** Right. *This is a long game. Microsoft's in this for the long game. They have this huge business, it's all enterprise collaboration. What they've been doing over the past three years is replicating all of Slack's best features, not unlike what Facebook has done to Snapchat.* We know how that's going for them, as we've talked about at length. Over time, Microsoft is just going to keep doing this. They're just going to keep copying all the things that people love about Slack, then undercut them on pricing, then sell that to all of their much larger customer base as a way to chip away at Slack's popularity. *Teams already has more daily active users than Slack.* That doesn't say how many customers there are, but the point is, it's already pretty competitive in terms of how big it is in terms of users. So, I think that over time, yeah, they could definitely keep chipping away, and that's what they're going to keep doing.

**Lewis:** *Shares of Slack now trade below where most people were probably able to first buy in, somewhere in the mid to high $30s. I think they're down about 20% from that point.*

Looking at 2019 in general, I've seen the phrase broken or underwater IPO more than I have at any other point following the financial markets. *It seems like we have had a ton of companies go public, and then, to be honest, post pretty underwhelming results that have taken their current share price and dropped it well below the offering price, Evan*.

### THE NORTHERN DISTRICT OF CALIFORNIA DENIES IN PART DEFENDANTS' MOTION TO DISMISS IN FEDERAL SECURITIES CASE

72.     On April 21, 2020, the U.S. District Court for the Northern District of California entered a decision denying, in part, the defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) in *Dennee v. Slack Technologies, Inc., et al.*, 3:19-cv-05857-SI (N.D. Cal.).  The court held the securities lead plaintiff adequately pleaded material misstatements and omissions in the Offering Documents concerning Slack's service outages and reimbursement program.  In regard

to allegations of material misstatements and omission in the Offering Documents concerning Slack's scalable architecture, competition with Microsoft, key benefits, and growth strategy the court granted the motion with leave to replead.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

73. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

74. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

75. Plaintiff is a current owner of the Company stock and has continuously been owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

76. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

77. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.

78. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

79. The Company Board is currently comprised of eight (8) members – Butterfield, Braccia, Cooper, Friar, Jordan, McNamara, O'Farrell, and Smith. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent

objective judgment about whether to bring this action or whether to vigorously prosecute this action.

80.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

81.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excluded from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

82.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

83.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

84.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## The Director Defendants Are Not Independent or Disinterested

**Defendant Butterfield**

85.     Defendant Butterfield is not disinterested or independent, and therefore, is incapable of considering demand because Butterfield (as CEO of the Company) is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

86.     This lack of independence and financial benefits received by Butterfield render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

87.     In addition, Butterfield is a defendant in the securities class action entitled *Dennee v. Slack Technologies, Inc., et al.*, 3:19-cv-05857-SI (N.D. Cal.), which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

88.     As such, Defendant Butterfield cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Braccia, Cooper, Friar, O'Farrell, and Smith**

89.     Each of these five Director Defendants is also a defendant in the securities class action entitled *Dennee v. Slack Technologies, Inc., et al.*, 3:19-cv-05857-SI (N.D. Cal.), which seeks to hold each liable for much of the same wrongdoing as is alleged herein.

90.     As such, each of these Director Defendants cannot independently consider any demand to sue himself/herself for breaching his/her fiduciary duties to the Company, as that would expose each of them to liability and threaten the livelihood of each.

**Defendants Friar, O'Farrell, and Smith**

91.     Defendants Friar, O'Farrell, and Smith served as members of the Audit and Risk Committee. Pursuant to the Audit and Risk Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*: Slack's accounting and financial reporting processes and internal controls, as well as the auditing and integrity of Slack's financial statements; Slack's compliance with applicable laws, regulations and internal compliance programs; the overall adequacy and effectiveness of Slack's legal, regulatory and ethical compliance programs, including Slack's Code of Conduct; communications with regulators or governmental agencies and any published reports that raise material issues regarding Slack's financial statements or accounting policies; and legal matters that may have a material impact on Slack's financial statements or Slack's compliance procedures that pertain to financial, accounting or tax matters of Slack.[3]

92.     Defendants Friar, O'Farrell, and Smith breached their fiduciary duties of due care, loyalty, and good faith because the Audit and Risk Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious disclosure and other deficiencies described herein. Thus, Defendants Friar, O'Farrell, and Smith face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

---

[3] *See* https://s23.q4cdn.com/371616720/files/doc_downloads/governance/Slack-Audit-and-Risk-Committee-Charter.pdf

## DAMAGES TO SLACK

93.     As a direct and proximate result of the Director Defendants' conduct, Slack will lose and expend many millions of dollars.

94.     Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO/Chairman of the Board, its CFO, its Chief Accounting Officer, and its Board at the time off the DPO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

95.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Director Defendants who breached their fiduciary duties to the Company.

96.     As a direct and proximate result of the Director Defendants' conduct, Slack has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## COUNT I

### Against the Director Defendants for Breach of Fiduciary Duty

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

99.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

100.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's Platform, agreements with subscribers, reimbursement obligations, competition, market status, future business prospects, and risks to revenues, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

102.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending at least one federal securities lawsuit, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**<u>Against the Director Defendants for Waste of Corporate Assets</u>**

103.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the period discussed herein. It resulted in continuous, connected and ongoing harm to the Company.

105.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) committing to paying outrageous and excessive (even by their own admission) rebates for service outages even while knowing that their Platform was highly susceptible and had an ongoing history of same; (ii) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (iii) awarding self-interested stock options to certain officers and directors; and (iv) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

106.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

107.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)    Awarding such other and further relief as is just and equitable.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: May 8, 2020

**O'KELLY & ERNST, LLC**

**OF COUNSEL:**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Tel: (302) 778-4000
Dir./Fax: (302) 778-4002
rernst@oelegal.com

**MOORE KUEHN, PLLC**
Justin A. Kuehn
Fletcher W. Moore
30 Wall Street, 8FL
New York, NY 10005
Tel: (212) 709-8245
jkuehn@moorekuehn.com
fmoore@moorekuehn.com

*Attorneys for Plaintiff*